FILED

05/10/2024

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 1, 2024

**IN RE ANGEL S. ET AL.**

**Appeal from the Juvenile Court for Anderson County**
**No. 22-0762, 22-0763     Brian J. Hunt, Judge**

_____

**No. E2023-00782-COA-R3-PT**

_____

This appeal involves our review of the trial court's decision to terminate the parental rights of a mother to her two minor children. Having carefully reviewed the record transmitted to us on appeal, we affirm the trial court's termination of the mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Laura A. Muscari, Morristown, Tennessee, for the appellant, Mindy G.

Jonathan Skrmetti, Attorney General and Reporter, and Carrie Perras, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

The Appellant Mindy G. ("Mother") is the mother to the two minor children at issue herein, Angel S. and Christopher S. (collectively "the Children").[1] Angel and Christopher were born in August 2009 and April 2012, respectively, and the record on appeal reveals that the Tennessee Department of Children's Services ("the Department") previously became involved with the family well before the instant matter. Indeed, in the wake of Christopher's birth, Mother had reported using oxycodone while pregnant with Christopher and had also reported to having had a history of drug use. Although this prior case

---

[1] This Court has a policy of protecting children's identities in parental termination cases. Therefore, where appropriate, certain surnames appearing herein have been presented by use of initials.

involving the family was closed in November 2012 upon the Department's observation at the time that "[Mother] has remained drug free," Mother was unfortunately not able to sustain this prior progress. Indeed, substance abuse concerns surrounding Mother would eventually trigger the Department's involvement with the family yet again. According to foster care case manager Autum Holoway ("Ms. Holoway"), who testified at the termination trial that underlies the present appeal, the Children entered foster care in September 2019 as a result of "environmental neglect and drug exposed child."

In a September 3, 2019, motion for emergency temporary custody, a guardian ad litem for the Children had requested that they be placed in the Department's custody, and in expressing concern for the Children's safety, the guardian ad litem had outlined in relevant part as follows to the Anderson County Juvenile Court ("the trial court"):

- That temporary custody of the Children had been placed with a paternal uncle but the uncle had relocated to Nashville and was "unavailable to care for the children."
- That the uncle had left the Children in the care of a family friend.
- That Mother was being treated in an inpatient rehabilitation program and was unavailable to provide care.
- That the Children's father[2] was located in Honduras and was unavailable.
- That the Children had been exposed to drug activity while living with Mother and their father.

The trial court thereafter entered an order awarding temporary legal custody of the Children to the Department, and later, per an "Adjudicatory Hearing Order" stamp-filed on December 2, 2019, the trial court found that the Children were dependent and neglected. That order specifically reflects that Mother stipulated that there were substance abuse issues.

The Department's involvement with the family prompted the creation of several family permanency plans. These plans were, in large part, substantially similar to one another in terms of the statement of responsibilities that they imposed on Mother. The first permanency plan, which was created on September 26, 2019, noted that allegations of drug use by Mother had led to the Department's involvement and also stated that Mother "has pending charges of felony theft and filing a false police report and has a restricted driver's license." Among other things, the plan included the following as responsibilities for Mother: provide proof of stable and legal income; demonstrate proof of housing; inform the family service worker if she does not have housing; provide documentation of any individuals living in the home; maintain stable housing and adequate furnishings; submit to announced and unannounced home visits; notify the family service worker within forty-eight hours of any change in housing; complete an alcohol and drug assessment and mental

---

[2] Although referenced here, we note that the Children's father surrendered his parental rights; the present Opinion concerns the termination of Mother's parental rights.

health assessment; be honest during the assessments and "sign a release for FSW to obtain a copy of the assessments"; follow all recommendations of the assessments; submit to and pass random drug screens; have access to reliable and legal transportation; provide proof of driver's license, registration, and insurance if she owns a vehicle; provide a transportation plan; participate and complete domestic violence classes; and resolve any pending legal issues. The plan also stated that Mother will pay child support. Other permanency plans specifically required Mother to maintain visitation, and other plans directed Mother to complete parenting education and demonstrate skills she had learned. Further, and as is of particular significance here given Mother's history of substance abuse, one of Mother's responsibilities in this custodial episode was to complete an intensive outpatient program, which was one of the recommendations from her alcohol and drug assessment. Moreover, Mother was responsible for participating in individual therapy as a result of a recommendation from her mental health assessment. When the trial court approved the permanency plans, it noted that the various responsibilities set out therein were reasonable and related to remedying the conditions that necessitated foster care. Whereas Mother complied with some of her responsibilities under the permanency plans, she was, as discussed later herein, notably noncompliant with respect to important requirements aimed at addressing her drug use.

In July 2022, the Department filed its petition to terminate Mother's parental rights. As a predicate to the termination of her rights, the Department averred two grounds for termination existed: (1) substantial noncompliance with permanency plan, *see* Tenn. Code Ann. § 36-1-113(g)(2), and (2) failure to manifest an ability and willingness to assume custody or financial responsibility of the Children, *see* Tenn. Code Ann. § 36-1-113(g)(14). The petition further averred that it was in the Children's best interests for the termination of Mother's rights to be granted. The trial court ultimately terminated Mother's parental rights on the basis of both of the grounds alleged against her and concluded that termination was, as alleged by the Department, in the Children's best interests. Through the present appeal, Mother challenges the termination of her parental rights.

## STANDARD OF REVIEW

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions." *In re M.L.P.*, 228 S.W.3d 139, 142 (Tenn. Ct. App. 2007). "Although this right is fundamental and superior to claims of other persons and the government, it is not absolute." *In re J.C.D.*, 254 S.W.3d 432, 437 (Tenn. Ct. App. 2007). "It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). In Tennessee, "[w]ell-defined circumstances exist under which a parent's rights may be terminated." *In re Roger T.*, No. W2014-02184-COA-R3-PT, 2015 WL 1897696, at *6 (Tenn. Ct. App. Apr. 27, 2015). Pursuant to the Tennessee Code, parties who have standing to seek the termination of a parent's parental

rights must prove two things. The petitioning party must first prove at least one of the statutory grounds for termination. *In re J.C.D.*, 254 S.W.3d at 438 (citing Tenn. Code Ann. § 36-1-113(c)(1)). Then, the petitioning party must prove that termination of parental rights is in the child's best interests. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)).

Because the decision to terminate a parent's parental rights has "profound consequences," trial courts must apply a higher standard of proof in deciding termination cases. *In re M.L.P.*, 228 S.W.3d at 143. "To terminate parental rights, a court must determine that clear and convincing evidence proves not only that statutory grounds exist but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007). This heightened burden of proof "minimizes the risk of erroneous decisions." *In re M.L.P.*, 228 S.W.3d at 143.

Due to the heightened burden of proof required under the statute, we must adapt our customary standard of review. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). "First, we must review the trial court's specific findings of fact de novo in accordance with Tenn. R. App. P. 13(d)." *In re M.J.B.*, 140 S.W.3d at 654. "Second, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *Id.*

## DISCUSSION

On appeal, Mother asserts that this Court should overturn the trial court's termination of her parental rights and raises three issues for our review. Mother's first issue, which generally submits that the trial court "overlooked crucial facts in evaluating the statutory grounds for termination," is lodged in connection with the trial court's findings pertaining to the first ground for termination found against her: substantial noncompliance with permanency plan. Mother's second issue challenges the sufficiency of the evidence as to the remaining ground for termination: failure to manifest an ability and willingness to assume custody or financial responsibility of the Children. As a final issue, Mother challenges the trial court's best interests determination, specifically asking "[w]hether the trial court erred by failing to afford adequate weight and consideration to the potential disruption of family relationships that may result from the termination of parental rights."

- 4 -

### *Grounds for Termination*

*Substantial Noncompliance with Permanency Plan*

Our review in this appeal begins with the ground for termination codified at Tennessee Code Annotated section 36-1-113(g)(2), which provides that a court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2). In conjunction with terminating a parent's parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014). "The trial court must then find that the noncompliance is substantial." *Id.* Although the termination statute does not define what conduct constitutes substantial noncompliance, terminating parental rights under this ground "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d at 656. The significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. "Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *Id.* at 548-49. Because determining whether substantial noncompliance exists is a question of law, we review the issue de novo with no presumption of correctness. *Id.* at 548.

Upon review of the record, it is manifest that this ground was sufficiently supported by the evidence. First, the responsibilities at issue were in fact reasonable and related to remedying the conditions that caused the Children to be in custody.[3] Moving on to the question of whether Mother was in substantial noncompliance with these responsibilities, we note that, although Mother did comply with some of the responsibilities of the permanency plans in this case, our task "involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d 507, 537 (Tenn. 2016). Again, the significance of the noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. In this case, Mother's use of illicit drugs has remained a central concern, and the initial exposition from this Opinion evidences that the history of Mother's struggles with drugs is a long one. The very first permanency plan itself detailed that the Department's involvement in this case was precipitated by allegations of drug use, and yet, despite the obvious importance of the responsibilities that were aimed to help Mother achieve a life of sobriety, her associated compliance with those responsibilities was severely lacking. As Mother's trial counsel candidly acknowledged in

---

[3] In general, Mother does not appear to disagree with this, even stating in her brief that "[t]he requirements outlined in the . . . permanency plan address the conditions that led to the placement of the children in foster care . . . ."

his opening statement at trial, foreshadowing the proof that was soon to come against his client, "[Mother] has not done well with her permanency plan, there's no question about that."

Although Mother did complete an alcohol and drug assessment, she was notably noncompliant with the recommended treatment, and further, she serially failed to appear for drug tests requested of her by the Department. As Ms. Holoway detailed Mother's shortcomings in great detail regarding these matters, we find it illustrative to highlight the following answers that Ms. Holoway provided in her testimony at trial:

Q. In October of 2019, [the Department] made a request for [Mother] to submit to a hair follicle or a nail bed drug test; is that correct?

A. Correct.

Q. Did [Mother] submit to that service?

A. She did not.

Q. [The Department] had paid for that nail bed or hair follicle drug test for [Mother]; is that correct?

A. Yes.

. . . .

Q. [Mother] did complete a mental health and alcohol and drug assessment in March of 2020; is that right?

A. It is.

Q. She received recommendations from that assessment for some follow-up treatment; is that correct?

A. Yes.

Q. Did [Mother] comply with those recommendations for treatment?

A. She did not.

Q. On April 4th, 2020, [Mother] was asked to complete a random drug screen . . . . Did she comply with that request?

A. She did not.

Q. On May 5th, 2020, [Mother] was asked to complete a random drug screen. Did she comply with that request?

A. She did not.

Q. On May 17th, 2020, [Mother] was asked to submit to a drug screen at her intensive outpatient treatment program, and she was positive on that drug screen; is that correct?

A. Yes.

Q. And at that time, she was positive for THC, methamphetamine, amphetamines and opiates; is that correct?

A. It is.

Q. [Mother] was then subsequently discharged from her substance abuse IOP program for noncompliance on May 17th, 2020; is that correct?

A. It is.

Q. And when she was discharged, there was a recommendation made that she restart a substance abuse intensive outpatient treatment program; is that correct?

A. Correct.

Q. [In] May . . . 2020, [Mother] submitted to a new mental health assessment and alcohol and drug assessment and it was recommended to complete IOP at that time; is that correct?

A. Yes.

. . . .

Q. On September 1st, 2020, [the Department] referred [Mother] to and actually paid for her to attend a substance abuse intensive outpatient program. Did [Mother] attend that program?

A. She did not.

Q.      On September 1st, 2020, [the Department] submitted a request for [Mother] to complete a hair follicle or nail bed drug test and paid for that service.  Did [Mother] complete that nail bed or hair follicle drug test?

A.      No, she did not.

This general line of questioning and answers continued in a similar fashion, with Ms. Holoway going on to further testify that Mother did not appear for drug tests in December 2020, in January 2021, in May 2021, in January 2022, or in February 2022.  Ms. Holoway further testified that, whereas the Department had referred Mother to another intensive outpatient treatment program in November 2021, Mother did not attend.  Ms. Holoway testified that Mother had not done anything to meaningfully address her substance abuse problem, and when explaining why she believed Mother was still engaged in substance abuse, Ms. Holoway stated that Mother had been arrested on the eve of trial "for possession of drug paraphernalia and for manufacture to re-sell of Schedule II." According to Ms. Holoway, Mother had made bond the morning of trial.

On cross-examination, Ms. Holoway testified that Mother had been signed up for "around seven or eight" programs but did not complete any of them.  It was her understanding from a review of Department records that Mother had left intensive outpatient treatment programs due to "anxiety."

In addition to testifying about the permanency plan responsibilities aimed at addressing Mother's drug issues, Ms. Holoway testified concerning other areas of noncompliance on the part of Mother.  According to Ms. Holoway, Mother had not, among other things, provided proof that she had safe housing.  When asked if she had any clue where Mother lived, Ms. Holoway testified as follows:

I do not.  [Mother] did provide an address at ou[r] previous court date in October of Millertown Pike.  And I went out to that home or that address, and it is a vacant lot.  The other address she provided, a mailing address which is . . . in Powell, I went out to that, and it is a business, it's a towing company, and you couldn't even pull into the parking lot.

According to other evidence in the record, Mother had reported the month before trial that she was "in between hotels and staying with friends."  Although Ms. Holoway further testified that Mother had completed a parenting assessment, she testified that Mother had not demonstrated that she had learned appropriate parenting skills.  According to Ms. Holoway, Mother had engaged in inappropriate behavior during a visitation session with the Children.  Of note, Ms. Holoway testified that Mother had brought a taser to the visitation.

In arguing against the application of this ground for termination, Mother's main

point on appeal is that the trial court "overlooked" that she has anxiety, something that she appears to position as a specific barrier to completion of outpatient treatment. As we understand her argument, she appears to be suggesting that the permanency plans set her up for failure because she could not complete outpatient treatment "without [first] addressing the underlying mental health issue." According to Mother, completing outpatient treatment was "extremely difficult" due to her anxiety.

In response to this argument, we first note that we agree with the sentiment offered by the Department in its appellate briefing, namely that, under the circumstances of this case, "Mother's continued drug use had to be remedied for the Children to be safely returned to her care, even if she had anxiety." Further, though, it should be stressed that Mother's responsibilities under the permanency plans did not forsake attention to her mental health. As covered earlier in this Opinion, Mother was responsible for participating in individual therapy as a result of a recommendation from her mental health assessment.

As it is, the fact remains that completion of outpatient treatment was a reasonable and appropriate requirement for Mother given the substance abuse concerns surrounding her in this case, but she simply did not follow through with that treatment. Moreover, as we have detailed herein, she also missed multiple drug screens, failures for which, incidentally, she does not appear to proffer her anxiety as an excuse. Mother's noncompliance with respect to these responsibilities was of course highly significant given the importance of resolving the drug concerns in this case, and in light of such failures and other areas of noncompliance, including Mother's failure to maintain stable housing, we conclude that this ground for termination was supported by clear and convincing evidence and therefore affirm the trial court's reliance on it.

*Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility of the Children*

We next turn our review to the ground for termination codified at Tennessee Code Annotated section 36-1-113(g)(14). That statute provides that a parent's rights may be terminated when he or she

> has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground for termination requires the Department to establish two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The Department must first prove that the parent "failed to manifest 'an ability and willingness

to personally assume legal and physical custody or financial responsibility of the child[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). Second, the Department must prove that placing the Children in the parent's legal and physical custody "would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

As to the first of the aforementioned prongs, the Tennessee Supreme Court has clarified that the statute "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020). Accordingly, "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied." *Id.* As to the second prong of this ground, we note that substantial harm can be supported through evidence of a parent's repeated criminal conduct and history of substance abuse. *See In re O.M.*, No. E2018-01463-COA-R3-PT, 2019 WL 1872511, at *4 (Tenn. Ct. App. Apr. 26, 2019); *In re Piper B.*, No. M2017-00930-COA-R3-PT, 2018 WL 3954328, at *10 (Tenn. Ct. App. Aug. 17, 2018).

As part of its conclusion that this ground for termination was sufficiently established, the trial court held as follows:

> [Mother] has failed to manifest, by act or omission an ability and willingness to personally assume the legal and physical custody of the children. She has not established safe and appropriate housing for the children. Additionally, [Mother] has not demonstrated that she can provide appropriate parenting for the children. [Mother] has not meaningfully addressed her substance abuse problem and is not demonstrating sobriety and was found in possession of methamphetamine, drug paraphernalia, and arrested within hours of this hearing.

> Placing the children in the Respondent [Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children. [Mother] has not demonstrated appropriate parenting and at one point provided the children with a tazer device at a visitation session. [Mother] has not demonstrated sobriety and is not meaningfully addressing her substance abuse problem and was found in possession of methamphetamine and drug paraphernalia and arrested within hours of this hearing.

> The child, Christopher, is placed in a foster home and his foster parents intend to adopt him. The child, Angel, is currently at Smoky Mountain Children's Home. The children visit with each other regularly and do not

wish to see [Mother]. The children have expressed their desire to be adopted.

We agree with the trial court's conclusion that clear and convincing evidence supported this ground for termination. As for the first prong, the evidence in the record clearly shows that Mother failed to manifest an ability to assume custody of the Children. Most notably, and in addition to the failure to establish appropriate housing, Mother's failure to achieve sobriety looms large in this case. Mother simply did not put herself in a position to care for the Children, and her failure to manifest such an ability is evidenced through multiple pieces of evidence throughout this record.

Moving on to the second prong, we note that, in her brief, Mother submits that the "only evidence provided by the court in the order [regarding the second prong] is an anecdotal incident that was misrepresented . . . ." The "anecdotal incident" to which Mother refers is the trial court's finding that Mother "provided the children with a tazer device at a visitation session." Initially, it should be clear from our prior excerpt of the trial court's order that the starting premise of Mother's statement is itself erroneous. That is, it is clear that the trial court did not limit its substantial harm analysis to the "anecdotal incident" regarding visitation. Indeed, the trial court clearly relied, in large part, on Mother's substance abuse issues, as it highlighted the fact that Mother "was found in possession of methamphetamine and drug paraphernalia and arrested within hours of this hearing."

Notwithstanding the faulty premise of her argument, the substantive point Mother attempts to make is also, ultimately, of no moment. Mother specifically challenges the finding that she "provided the children with a tazer," arguing that this is a misrepresentation of what is in the record. Specifically, she argues that she "did not provide her children with a taser, but it was rather taken from her purse unknowingly by her child." It is true, we conclude, that the evidence appears to support Mother's characterization of this episode. Although Ms. Holoway had specifically testified that "[t]here was a device brought to the visit for the boys to play with instead of interacting with the parent," Ms. Holoway's testimony on this matter had been purportedly informed by certain records created by the Department, and of note, the associated records support Mother's take on the event, stating as follows: "[The child] had got a hold of a tazer. [The child] brought the item home . . . and one of the other children were shocked with it. . . . The mother . . . expressed that she had it in her purse and was unaware that [the child] took this from her bag."[4] Yet, we conclude that such passive negligence (as opposed to directly and actively giving the child such a device) offers Mother little cover. Indeed, the fact remains that Mother brought a dangerous device to visitation and that one of the Children obtained it and later shocked someone else with it. Clearly, appropriate safeguards were not followed to ensure that the Children would not obtain the device. The trial court's concern for Mother's failure to

---

[4] The Department's brief also notably parrots what is stated in the associated record, stating that "[the child] **was able to get ahold** of Mother's taser." (emphasis added)

- 11 -

demonstrate appropriate parenting is not misplaced in light of the evidence.

Of course, as noted above, the trial court did not limit its substantial harm finding on the basis of this visitation incident and Mother's failure to demonstrate appropriate parenting. The trial court also focused on the outstanding concerns pertaining to drug use, and given the evidence establishing that Mother's substance abuse concerns persisted at the time of trial[5]—indeed, not only did Mother never complete outpatient treatment, she was also arrested on the very eve of trial "for possession of drug paraphernalia and for manufacture to re-sell of Schedule II"—there was clear and convincing evidence supporting the second prong for this ground. As we noted earlier, substantial harm can be supported through evidence of a parent's repeated criminal conduct and history of substance abuse. *See In re O.M.*, 2019 WL 1872511, at *4; *In re Piper B.*, 2018 WL 3954328, at *10; *see also In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) ("And parents with a significant, recent history of substance abuse, mental illness, and/or domestic violence could lead to a conclusion of a risk of substantial harm."). This ground for termination is hereby affirmed.

### Best Interests Inquiry

When at least one ground for termination has been properly established against a parent, as it has in this case, we turn our focus to whether termination of the parent's parental rights is in the child's best interests. "Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013). As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)).

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). Tennessee Code Annotated section 36-1-113(i), which lists factors to be considered as part of the best interests inquiry, states that the trial court "shall consider all relevant and child-centered factors applicable to the particular case before the court." Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's

---

[5] Mother's trial counsel argued no differently at trial. In closing argument, he stated as follows: "And in the case of [Mother], the problem that puts her children into foster care is her drug addiction which continues to plague her to this day, sadly."

best interests does not call for a rote examination" of statutory factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *Moody*, 171 S.W.3d at 194).

In this case, in highlighting the considerations that had informed its conclusion that there was clear and convincing evidence that termination of Mother's parental rights was in the best interests of the Children, the trial court outlined in relevant part that the Children have a critical need for stability and continuity of placement and are making progress in their individual placements; that the Children have not experienced stability with Mother and have each expressed that they do not want to see Mother; that a change in caretakers and physical environment is likely to have a negative effect on the Children's emotional and psychological condition and that the Children are at risk of regression if disrupted from their current environment; that Mother has failed to demonstrate continuity and stability in meeting the Children's needs; that Mother has had inconsistent contact with the Children; that Mother does not have safe or appropriate housing; that Mother was incarcerated on new criminal behavior within twenty-four hours of the termination hearing; that Mother and the Children do not have a healthy and secure attachment and there is no reasonable expectation that Mother can create such an attachment; that the Children are refusing contact with Mother; that the Children have created a healthy attachment with others in the absence of Mother; that Mother has failed to demonstrate a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the Children to be in her home; that Mother is still abusing drugs and has not demonstrated sobriety; and that because Mother continues to engage in criminal activity, she is unable to consistently care for the Children in a safe and stable manner.

Additionally, the trial court found that Mother had failed to take advantage of available programs and resources to assist in making a lasting adjustment of circumstances; that the Department had made efforts to assist Mother in addressing the concerns in her home; that Mother failed to demonstrate any sense of urgency in addressing the circumstances and conditions that brought the Children into foster care; that Mother had ample time to make progress on her substance abuse problem and lack of appropriate housing; that Mother demonstrated neglect toward the Children; and that Mother had continued to prioritize her substance abuse over the Children.

Having reviewed the record transmitted to us on appeal, we conclude that the evidence clearly and convincingly supports the trial court's determination that the termination of Mother's parental rights was in the Children's best interests. As we have discussed earlier, and as emphasized by the trial court, Mother has not addressed her substance abuse concerns. Moreover, as the trial court referenced in its best interests analysis, Mother had ample time to make progress on her substance abuse problem. Yet, this problem did not get meaningfully addressed, and as a punctuation to the concern, Mother was arrested on the eve of trial "for possession of drug paraphernalia and for

manufacture to re-sell of Schedule II." Mother simply did not demonstrate an ability to care for the Children at the time of trial, and in addition to the substance abuse issue, concerns over her housing, or lack thereof, remained.

By the time of trial, the Children were refusing to visit with Mother. According to Ms. Holoway, Christopher was in a pre-adoptive home and was "thriving" and "doing phenomenal." He was making A's in school, and Ms. Holoway relayed that Christopher had reported that he wanted to remain with the foster parents and be adopted. As for Angel, he was at the Smoky Mountain Children's Home at the time of trial and "doing well." Ms. Holoway testified that he was "just addressing some of the recommendations that were given from his assessment" but that the Department was "actively looking for a pre-adoptive foster home for him." According to Ms. Holoway, he "does want to be adopted" and "does not want any contact" with Mother. Further, he reportedly did not believe that he would be safe living with Mother.

Whereas Mother has generally expressed concern about preserving sibling bonds, noting that the Children were separated from one another, such a concern is but one of the many factors that can inform the bests interests determination. *See* Tenn. Code Ann. § 36-1-113(i)(1)(I) (including the following as *a* factor: "Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage"). In any event, the proof before the trial court was that the Department and Christopher's foster parents were trying to facilitate a continued relationship between the Children.

Further, Mother's articulated concern notwithstanding, the circumstances of this case clearly favor termination. Mother was in no position to care for the Children at the time of trial for the reasons previously discussed, and this was true despite the fact that several years had passed from the onset of the current custodial episode. The Children, who both reportedly want to be adopted, deserve a chance at some permanency in their lives, and they should not be left in limbo any longer. In light of all of the above, and the evidence that is in the record, we hereby affirm the trial court's conclusion that termination of Mother's parental rights was in their best interests.

## CONCLUSION

The trial court's termination of Mother's parental rights is hereby affirmed.


      s/ Arnold B. Goldin
      ARNOLD B. GOLDIN, JUDGE